UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRAKASH AJWANI,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>HANMI BANK, a California Corporation; and DOES 1 to 10, inclusive,<br><br>　　　　Defendants. | Case No. CV 14-2423 FMO (FFMx)<br><br>**ORDER Re:  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Having reviewed and considered all the briefing filed with respect to defendant Hanmi Bank's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. 25, "Motion"), the court concludes that oral argument is not necessary to resolve the Motion. See Fed. R. Civ. P. 78; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

**INTRODUCTION**

On March 31, 2014, plaintiff Prakash Ajwani ("plaintiff" or "Ajwani") filed a Complaint against defendant Hanmi Bank ("defendant" or "Hanmi"), alleging that Hanmi, his former employer, intentionally discriminated against him on the basis of race or national origin in violation of: (1) 42 U.S.C. § 1981 ("§ 1981"); (2) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); and (3) the California Fair Employment and Housing Act, Cal. Gov't Code § 12900, et seq. ("FEHA").  (See Dkt. 1, Complaint at ¶¶ 37-48).

# STATEMENT OF FACTS[1]

Ajwani, a California resident of East Indian descent, began working at Hanmi's Artesia branch in 2001. (See Dkt. 25-1, Statement of Uncontroverted Facts ("SUF") at D1 & D4-D5). During the course of his employment, Ajwani held the position of Business Development Officer ("BDO"), which entailed generating new loans for Hanmi as well as opening and maintaining client checking accounts. (See Dkt. 27, Amended Joint Evidentiary Appendix Re: Hanmi Bank's Motion for Summary Judgment ("Joint App'x"), Declaration of Prakash Ajwani ("Ajwani Decl.") at ECF 351, ¶ 2). While employed as a BDO, Ajwani was paid a base salary plus certain benefits and incentive compensation. (See Dkt. 25-1, SUF at D18). Ajwani's incentive compensation was calculated as 0.2% of all "booked and funded" loans over $5 million that he referred to Hanmi. (See Dkt. 27, Ajwani Decl. at ECF 361, ¶ 52).

On Friday, January 31, 2014, Ajwani resigned from his position at Hanmi. (See Dkt. 25-1, SUF at D7). The following Monday, February 3, 2014, Ajwani began working for BBCN Bank in a role equivalent to the one he had performed for Hanmi and with an equivalent compensation structure. (See id. at D8 & D10-14). Hanmi later hired a replacement, also of East Indian descent, to take over Ajwani's former position. (See id. at D15).

# LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.

The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each

---

[1] Unless otherwise indicated, the following facts are undisputed and/or contain disputes that are not material.

cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[2] A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party. See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995 (1992). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive

---

[2] "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56-3.

1 summary judgment; "there must be evidence on which the [fact finder] could reasonably find for
2 the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

## DISCUSSION

Ajwani contends that Hanmi "intentionally discriminat[ed]" against him in violation of § 1981, Title VII, and FEHA. (See Dkt. 1, Complaint at ¶¶ 38, 42 & 46). Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). "Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case." Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 850 (9th Cir. 2004); see also Metoyer v. Chassman, 504 F.3d 919, 932 (9th Cir. 2007), cert. dismissed, 553 U.S. 1049 (2008) ("[T]he same standards are used to prove both claims, and facts sufficient to give rise to one are sufficient to give rise to the other."). Additionally, "California courts have relied upon federal interpretations of Title VII to interpret analogous provisions of [FEHA]." Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996); see Reno v. Baird, 18 Cal.4th 640, 647-48 (1998) (same). Accordingly, the court will analyze whether summary judgment should be granted as to all of Ajwani's claims simultaneously. See, e.g., Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105-09 (9th Cir. 2008) (addressing merits of plaintiff's § 1981 and Title VII claims jointly); Escandon v. Los Angeles Cnty., 584 Fed.Appx. 517, 519 (9th Cir. 2014), cert. denied, 135 S.Ct. 1506 (2015) (same); Bradley, 104 F.3d at 270-71 (analyzing merits of plaintiff's Title VII and FEHA claims jointly); Clark v. Claremont Univ. Ctr. & Graduate Sch., 6 Cal.App.4th 639, 662-63 (1992) (same).

As a general matter, there are two distinct theories under which plaintiff can assert his Title VII and FEHA claims: disparate treatment and disparate impact. See EEOC v. Abercrombie & Fitch Stores, 135 S.Ct. 2028, 2032 (2015) ("These two proscriptions . . . are the only causes of action under Title VII."); Heard v. Lockheed Missiles & Space Co., 44 Cal.App.4th 1735, 1748 (1996) ("In general, there are two types of illegal discrimination [under FEHA]. These are

disparate treatment and disparate impact."). Disparate treatment involves intentional discrimination, and occurs when an employer treats one employee less favorably than another on account of race, color, religion, sex, or national origin. See Ricci v. DeStefano, 557 U.S. 557, 577, 129 S.Ct. 2658, 2672 (2009). Disparate impact, on the other hand, occurs when an employer's policy or practice has a disproportionately adverse effect on a protected class, regardless of whether the employer had a discriminatory intent or motive.[3] See id. at 577-78, 129 S.Ct. at 2672-73. Unlike plaintiff's Title VII and FEHA claims, his § 1981 claim can only be established under a theory of disparate treatment, not disparate impact. See Gen. Bldg. Contractors Ass'n v. Pa., 458 U.S. 375, 389, 102 S.Ct. 3141, 3149 (1982) (concluding that "§ 1981 reaches only purposeful discrimination"); Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate, 470 F.3d 827, 837 (9th Cir. 2006) (explaining that, "[i]n General Building Contractors, the Court limited § 1981 to cover only acts involving intentional discrimination, excluding from the statute's reach actions that merely have a disparate effect").

I.   DISPARATE TREATMENT.

The court analyzes disparate treatment claims under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). Under this framework, plaintiff "must first establish a prima facie case of discrimination by offering evidence that 'give[s] rise to an inference of unlawful discrimination.'" EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981)). Plaintiff may establish a prima facie case "either by meeting the four-part test laid out in [McDonnell Douglas] or by providing direct evidence suggesting that the employment decision was based on an impermissible criterion." Id. (citation omitted); see also Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) ("The prima facie case may be based either on a presumption arising from the [McDonnell Douglas factors] or by more direct evidence of discriminatory intent."). "The requisite degree of proof necessary to establish a prima facie case

---

[3] Here, plaintiff seeks to impose both theories of liability upon Hanmi. (See Dkt. 25, Motion at ECF 8, Joint Memorandum of Points and Authorities ("Joint Br.") at 1 & 7-14).

5

1 . . . on summary judgment is minimal and does not even need to rise to the level of a
2 preponderance of the evidence." Wallis, 26 F.3d at 889. If plaintiff succeeds in establishing a
3 prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory
4 reason for the allegedly discriminatory conduct. See Vasquez v. Cnty. of Los Angeles, 349 F.3d
5 634, 640 (9th Cir. 2003). If defendant articulates such a reason, the burden shifts back to plaintiff
6 to show that the articulated reason was a mere pretext for discrimination. See id.

      A.      Direct Evidence.

As an initial matter, plaintiff has offered no direct evidence of discriminatory intent. "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (alteration marks omitted). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005). Here, plaintiff cites only one fact in support of his argument that "[t]here is evidence of direct discrimination" in this case: one of plaintiff's clients, Mr. Singh, reported that his brother was denied service at Hanmi's Fullerton branch and was told to go to Hanmi's Artesia branch because "[his] Indian officer is there." (See Dkt. 25, Joint Br. at 9; Dkt. 27, Declaration of Kashmir Singh ("Singh Decl.") at ECF 367). While troubling, this lone statement is not sufficient to raise an inference of discriminatory intent against plaintiff. Mr. Singh's brother was not even one of plaintiff's clients, and there is no evidence to establish any nexus between plaintiff and Mr. Singh's brother.

Further, even assuming Mr. Singh's brother was one of plaintiff's clients, plaintiff does not explain how alleged discrimination against Mr. Singh's brother by an employee of another branch gives rise to employment discrimination against plaintiff. (See, generally, Dkt. 25, Joint Br.; Dkt. 29, Supplemental Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment ("Pl. Supp.")). Moreover, according to Mr. Singh, the statement was made by a customer service employee, (See Dkt. 27, Singh Decl. at 47), not by a decision-maker with the power to affect plaintiff's "terms, conditions, or privileges of employment." See 42 U.S.C. § 2000e-2(a)(1); see Cal. Gov't Code § 12940 (same). When a discriminatory statement is made

by a non-decision-maker, a plaintiff "must show a nexus between [the] discriminatory remarks and [the] subsequent employment decisions" that adversely affected him. Vazquez, 349 F.3d at 640 (finding no direct evidence of discriminatory intent where plaintiff failed to show nexus between supervisor's discriminatory remarks and decision-maker's employment decisions); see also Miller v. Graham Cnty., 635 Fed.Appx. 362, 364 (9th Cir. 2015) (dismissing gender discrimination claim where plaintiff "fail[ed] to allege any nexus between the [discriminatory] comments and any discriminatory employment action"); DeHorney v. Bank of Am. Nat'l Trust & Sav. Ass'n, 879 F.2d 459, 468 (9th Cir. 1989) (dismissing wrongful termination suit because plaintiff "failed to establish a nexus between the alleged racial slur and the decision to terminate"); McMillan v. Abbott Labs., Inc., 2013 WL 1003136, *5 (W.D. Wash. 2013) ("Assuming, however, that Plaintiff has properly set forth a 'direct evidence' argument, the court finds that it fails. Where a plaintiff cites discriminatory statements as evidence of an employer's intent, the plaintiff must also demonstrate a nexus between the statements and the alleged adverse employment action.").

   The record does not suggest, and plaintiff does not contend, that plaintiff's employment was adversely affected by the discriminatory statement made by a customer service employee to the brother of one of plaintiff's clients at a different branch. (See, generally, Dkt. 25, Joint Br.; Dkt. 27, Joint App'x). Rather, plaintiff argues that the statement proves Hanmi's discriminatory intent because it was made around the same time as the alleged adverse employment actions took place. (See Dkt. 25, Joint Br. at 9). This connection is far too attenuated to justify the logical leap urged by plaintiff. The court cannot conclude that defendant's officers and managers had discriminatory animus toward plaintiff merely because one of its customer service employees from another branch made alleged discriminatory statements to the relative of one of plaintiff's clients. Because plaintiff cannot show a nexus between the discriminatory statement and the alleged adverse employment actions, he has failed to meet his prima facie burden through direct evidence. He therefore "must proceed under the McDonnell Douglas framework." Vazquez, 349 F.3d at 641.

   B. McDonnell Douglas.

   Under McDonnell Douglas, plaintiff may satisfy his prima facie burden through

circumstantial or indirect evidence if he shows that: (1) he belongs to a protected class; (2) he was qualified for his position and performed his job satisfactorily; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. See Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1156 (9th Cir. 2010). The first two McDonnell Douglas factors are not in dispute. Both parties agree that plaintiff is of East Indian descent, (see Dkt. 25-1, SUF at D1), which renders him a member of a protected class. Defendant also does not dispute that plaintiff was qualified for his position and performed his job satisfactorily. (See, generally, Dkt. 25, Joint Br.). Defendant's argument for summary judgment focuses on the third and fourth McDonnell Douglas factors. Defendant contends that plaintiff "did not suffer an adverse employment action in that he resigned his employment[,]" (See Dkt. 25, Joint Br. at 1), and plaintiff did "not produce any evidence that he was treated differently from similarly-situated employees." (See Dkt. 30, Defendant Hanmi Bank's Supplemental Memorandum in Support of Motion for Summary Judgment [] ("Def. Supp.") at 2).

      The Ninth Circuit "define[s] 'adverse employment action' broadly." Fonseca, 374 F.3d at 847. "[A] wide array of disadvantageous changes in the workplace constitute adverse employment actions." Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); see, e.g., Hashimoto v. Dalton, 118 F.3d 671, 676 (9th Cir. 1997), cert. denied, 523 U.S. 1122 (1998) (holding dissemination of an unfavorable job reference was an adverse employment action); Strother v. S. Cal. Permanente Med. Grp., 79 F.3d 859, 869 (9th Cir. 1996) (finding adverse employment actions where plaintiff was excluded from meetings, seminars, and positions that "may have put her in a position for merit pay increases"); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Transfers of job duties and undeserved [negative] performance ratings, if proven, would constitute 'adverse employment decisions.'"). In addition, "an adverse employment action exists where an employer's action negatively affects its employee's compensation." Fonseca, 374 F.3d at 847; see also Little v. Windermere Relocation, Inc., 301 F.3d 958, 970 (9th Cir. 2002) (holding that a reduction in base monthly pay was an adverse employment action). Finally, an employer's failure to promote an employee can constitute an adverse employment action. See Lyons v. England, 307 F.3d 1092, 1113-14 (9th Cir. 2002) (outlining standards for

a Title VII "failure-to-promote" claim and finding an adverse employment action where plaintiff was denied a promotion).

Plaintiff asserts five separate adverse employment actions, each of which charges defendant with treating plaintiff differently from similarly-situated Korean-American employees. (See Dkt. 25, Joint Br. at 11). Plaintiff contends:

> (1) [that] he was passed up for promotion as a branch manager when less qualified Korean employees were promoted over him; (2) that his commission structure was below that paid to other Korean employees; (3) that he was not paid bonuses that he was entitled to when other Korean employees, similarly situated, were paid such bonuses; (4) that his Asian-Indian clients were delayed unnecessarily in their loan applications; [and] (5) that other Korean employees attempted to take business from him by offering his Asian-Indian clients better loan terms which he was not able to offer or produce inflated appraisal, and that when he complained to management, instead of reprimanding such Korean employees, he was told to not bring the matter up any further and then was subject to retaliatory actions by his superiors by taking away his long standing privileges of immediate bank deposit approvals without holds for his clients.

(See id.).

Here, plaintiff's second, third, fourth, and fifth grounds all assert actions taken by defendant that would negatively affect plaintiff's compensation.[4] (See Dkt. 25, Joint Br. at 11). Plaintiff's first ground asserts that defendant failed to promote him. (See id.).

---

[4] Grounds two and three relate directly to plaintiff's compensation, i.e., plaintiff argues that he received less compensation than similarly-situated employees due to lower commissions and bonuses. (See Dkt. 25, Joint Br. at 11). Grounds four and five propose a less direct, but still tenable, connection to plaintiff's compensation. Both grounds assert that defendant created and supported a working environment designed to drive business away from plaintiff and toward similarly-situated employees. (See id.). Given that plaintiff's compensation was based in substantial part on commissions, (see Dkt. 27, Ajwani Decl. at ECF 361, ¶ 52), any business that he lost to other employees could reduce his total compensation.

As noted earlier, defendant argues that plaintiff did not suffer an adverse employment action because he was not terminated but rather resigned his employment. (See Dkt. 25, Joint Br. at 1). Defendant improperly characterizes plaintiff's claim as one for "constructive discharge," (see id. at 4), a type of adverse employment action that "occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000) (quotation marks omitted). By contending that "[t]he only effect identified in Ajwani's complaint that may fairly be read to constitute an adverse employment action is the end of his employment with Hanmi," (Dkt. 25, Joint Br. at 4), defendant ignores authority that recognizes adverse employment actions in circumstances far less severe than termination. See Doe v. State of Ariz., 2016 WL 1089743, *2 (D. Ariz. 2016) ("In the Ninth Circuit, the term 'adverse employment action' is defined broadly and is not limited to ultimate employment actions such as hiring, firing, promoting, and demoting."). Plaintiff therefore does not, as defendant argues, "bear[] the burden to establish a constructive termination" to overcome summary judgment.[5] (See Dkt. 25, Joint Br. at 4). Plaintiff can establish any recognized adverse employment action to make out his prima facie case.

Defendant also argues that plaintiff's disparate treatment claim is barred because the employee who replaced him is also of East Indian descent, and thus a member of the same protected class.[6] (See Dkt. 25, Joint Br. at 6). In support of this argument, defendant cites several wrongful termination cases from courts outside this circuit in which summary judgment was granted because the plaintiffs were "replaced by a member of the same protected category."

---

[5] Despite defendant's interpretation of plaintiff's claim as one for constructive discharge, plaintiff does not argue that constructive discharge is a valid ground for an adverse employment action in this case. (See, generally, Dkt. 25, Joint Br.; Dkt. 29, Pl. Supp.). The court therefore need not address the merits of a theoretical claim based on constructive discharge.

[6] Defendant's argument ignores plaintiff's allegations that at least two employees promoted over him were of Korean descent, (see Dkt. 27, Ajwani Decl. at ECF 362, ¶¶ 57-60), and thus were not members of the same protected class.

(Id.) (citing Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005); White v. Pacifica Found., 973 F.Supp.2d 363, 381 (S.D.N.Y. 2013); Pearson v. Merrill Lynch & Bank of Am., N.A., 2012 WL 983546, *8 (S.D.N.Y. 2012)). These courts reasoned that "[t]he fact that plaintiff was replaced by a member of the same protected class . . . undermines any inference of discriminatory intent." White, 973 F.Supp.2d at 381; see also Murray, 406 F.3d at 715 (similar); Pearson, 2012 WL 983546 at *8 (similar). While this may be true in a wrongful termination case, it is unpersuasive here. Even assuming an employer who fires someone for being East Indian would likely not hire another East Indian as a replacement, that does not mean an employer who under-compensates or refuses to promote an East Indian might not hire another East Indian if the first resigns. For this reason, the Ninth Circuit "formulate[s] the fourth element of the McDonnell Douglas prima facie case in terms that suggest that it makes no difference whether similarly-situated, favorably-treated employees belong to the plaintiff's protected class." Creekmore v. U.S. Bank, N.A., 2010 WL 3211925, *4 (W.D. Wash. 2010); see also Quaranta v. Mgmt. Support, 255 F.Supp.2d 1040, 1049 (D. Ariz. 2003) ("Ninth Circuit precedent describes the fourth element of discrimination claims in terms of either replacement or comparison to similarly situated individuals.") (emphasis in original); Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002) (in sex discrimination case, defining fourth McDonnell Douglas factor as a showing that "similarly situated men were treated more favorably, or her position was filled by a man"). "[T]he Ninth Circuit has held that a plaintiff can make a prima facie case of discrimination even if he or she is replaced by a member of the same protected class[.]" Quaranta, 255 F.Supp.2d at 1049 (citing Lyons, 307 F.3d at 1092); see also Diaz v. Am. Tel. & Tel., 752 F.2d 1356, 1360 (9th Cir. 1985) ("[A] plaintiff is not precluded from bringing suit merely because a person of the same protected class is selected for the challenged position."); Creekmore, 2010 WL 3211925 at *4 ("When courts have squarely confronted the contention that replacing a plaintiff with a member of his or her protected class is a bar to liability, they have rejected it."). Thus, defendant is "mistaken in its apparent belief that it cannot be liable for discrimination because it hired," id., a replacement for plaintiff of

East Indian descent.[7] See Pieszak v. Glendale Adventist Med. Ctr., 112 F.Supp.2d 970, 989 (C.D. Cal. 2000) (holding, in sex discrimination case brought by female plaintiff, that "the fact that [plaintiff] was replaced by another female is irrelevant to determining whether the McDonnell Douglas factors are met").

Finally, defendant argues that plaintiff has failed to produce evidence in conjunction with each of his five asserted adverse employment actions showing that he was treated less favorably than similarly situated employees. (See Dkt. 30, Def. Supp. at 2). The court agrees. First, plaintiff contends that "he was passed up for promotion as a branch manager when less qualified Korean employees were promoted over him." (See Dkt. 25, Joint Br. at 11). Typically, to make out a failure to promote claim, a plaintiff must show that "he applied for and was qualified for an available position" and "was rejected despite his qualifications." Lyons, 307 F.3d at 1112.

Here, plaintiff neither argues nor produces evidence that he applied for any promotions within Hanmi. (See, generally, Dkt. 25, Joint Br.; Dkt. 27, Ajwani Decl.; Dkt. 29, Pl. Supp.). Nonetheless, the Ninth Circuit "do[es] not require that a plaintiff prove that he applied for an available position when making a failure-to-promote claim against the employer if the trier of fact could reasonably infer that promotions were not awarded on a competitive basis." Lyons, 307 F.3d at 1114. A plaintiff also need not establish that he applied for an available position where the employer neither posted job openings nor accepted formal applications. See id. (citing Jones v. Firestone Tire & Rubber Co., 977 F.2d 527, 533 (11th Cir. 1992), cert. denied, 508 U.S. 961 (1993)); see also Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1124-25 (9th Cir. 2000) (holding professor was not required to show he applied for position to sustain failure to promote claim where the evidence showed no formal application was required). Under these circumstances, "an employer's discriminatory treatment consists of a failure to consider an applicant's qualifications, or in the use of evaluative criteria that are discriminatory," rather than

---

[7] The importance of the national origin of plaintiff's replacement is further diminished because the record is unclear as to whether he was hired before or after plaintiff instituted this action. (See Dkt. 25-1, SUF at D15). "Subsequent hiring or promotion practices are clearly not relevant to the question of whether discrimination occurred prior to the commencement of a Title VII action." Gonzales v. Police Dep't, 901 F.2d 758, 762 (9th Cir. 1990).

12

an affirmative rejection of a plaintiff's application. Fadhl v. City and Cnty. of S.F., 741 F.2d 1163, 1165-66 (9th Cir. 1984), overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989).

But even under these standards, plaintiff has not met his burden. Plaintiff neither argues nor produces evidence showing that promotions were not made on a competitive basis or that Hanmi did not post job openings or accept formal applications. (See, generally, Dkt. 25, Joint Br.; Dkt. 27, Ajwani Decl.; Dkt. 29, Pl. Supp.). The record contains no evidence at all regarding defendant's policies, practices, or processes for deciding which employees to promote. (See, generally, Dkt. 25-1, SUF; Dkt. 27, Joint App'x). The only evidence in the record discussing promotions is plaintiff's own declaration where plaintiff states that "Hanmi never promoted [him] even when the opportunities existed at [his] Artesia Branch as well as Hanmi's other branches." (See Dkt. 27, Ajwani Decl. at ECF 362, ¶¶ 57 & 60). Plaintiff further states that three other employees of Korean origin were promoted to the position of Branch Manager at the Artesia branch. (See id. at ECF 362, ¶¶ 58-60). But plaintiff does not state or provide any evidence to show that Hanmi's promotion decisions were non-competitive, not based on formal applications, or made without posted job openings. (See, generally, Dkt. 27, Joint App'x). Without such evidence, plaintiff cannot raise a genuine issue of material fact that he was similarly situated to the Korean employees who received the challenged promotions.[8]

Second, plaintiff asserts that he was under-compensated in comparison to defendant's Korean employees through his salary, commission structure, and bonuses. (See Dkt. 25, Joint Br. at 11). With respect to plaintiff's salary and commission structure, plaintiff states that, "everytime [he] was given a raise by Hanmi, Hanmi nullified the raise in effect by raising the commission goals so that . . . for the time period that [he was] employed at Hanmi . . . [he] lost over $169,451." (See Dkt. 27, Ajwani Decl. at ECF 262-63, ¶ 63). Even accepting this statement

---

[8] Plaintiff also fails to demonstrate, as required to meet his prima facie burden, that he was qualified for the promotions at issue. See Lyons, 307 F.3d at 1112 (holding plaintiff alleging failure to promote claim must show that he "was qualified for an available position" and "was rejected despite his qualifications"); (see, generally, Dkt. 27, Joint App'x).

as true, plaintiff offers no evidence showing that similarly situated employees were not subject to the same commission structure. (See, generally, Dkt. 25, Joint Br.; Dkt. 29, Pl. Supp.). The only evidence addressing this issue was produced by defendant, and it shows that plaintiff's compensation was commensurate with similarly situated employees. (See Dkt. 27, Declaration of Greg Kim ("Kim Decl.") at ECF 327-28, ¶ 9) (showing that plaintiff's base salary and total compensation were higher than many similarly situated employees).

In his Supplemental Brief, plaintiff points to a memorandum dated November 25, 2005, as evidence that "directly supports plaintiff's position." (Dkt. 29, Pl. Supp. at 8; see Dkt. 27, Memorandum Re: Contract Terms and Conditions for Mr. Prakash Ajwani (Marketing Officer) dated November 25, 2005 ("November 2005 Memo"), at ECF 456-57). In pertinent part, the November 2005 Memo states that, "[d]ue to the $10 million minimum requirement, the compensation rate is lower than other LPO BDOs and unlike other LPO BDOs, he also contributes greatly to the deposit side." (Dkt. 27, November 2005 Memo at ECF 457). Contrary to plaintiff's interpretation, this sentence does not show that similarly situated employees were compensated at a higher rate than plaintiff. The record does not define an "LPO BDO" and there is no evidence that plaintiff held that title or performed the responsibilities that are required of that position. (See Dkt. 27, Ajwani Decl. at ECF 351, ¶ 2) (stating plaintiff's job titles were "Senior Vice President and Marketing Officer and Business Development Officer ('BDO')" but not mentioning an "LPO BDO").

Further, even if plaintiff were an "LPO BDO," the mere fact that employees share the same title does not mean they are similarly situated. See, e.g., Morgan v. City of Jasper, 959 F.2d 1542, 1545-46 (11th Cir. 1992) (rejecting compensation-based discrimination claim where plaintiff, an assistant supervisor, failed to show that other assistant supervisors "had duties comparable to those of [plaintiff] and therefore that their salaries were relevant"); Brainard v. City of Topeka, 597 Fed.Appx. 974, 979 (10th Cir. 2015) (finding plaintiff failed to show male employee was similarly situated when he had the same title but different responsibilities and more experience); Perry v. Clinton, 831 F.Supp.2d 1, 17-18 (D.D.C. 2011) (finding employees with same title were not similarly situated because their "employment situation is different in relevant respects"). Without evidence that plaintiff's duties and responsibilities were comparable to those of the "LPO

BDOs" mentioned in the November 2005 Memo, plaintiff fails to raise a genuine issue of material fact that these employees were similarly situated to him.

Third, with respect to bonuses, plaintiff argues that he was entitled to a bonus in 2013 and did not receive it, even though at least one similarly situated employee did. (See Dkt. 1, Complaint at ¶ 11). Defendant responds that no employee performing the same job as plaintiff received a bonus in 2013; the only employee who did receive a bonus was eligible because "he spent the first half of the year in a different position that qualified for" the bonus.[9] (See Dkt. 25, Joint Br. at 15). Plaintiff offers no counter-argument to this point, (see, generally, Dkt. 29, Pl. Supp.), and the record does not contain any evidence showing either that plaintiff was entitled to a bonus or that any similarly situated employees received a bonus that plaintiff did not. (See, generally, Dkt. 27, Joint App'x).

Fourth, plaintiff argues that "his Asian-Indian clients were delayed unnecessarily in their loan applications[,]" implying that the clients of similarly-situated employees were not so delayed. (See Dkt. 25, Joint Br. at 11). The undisputed evidence shows, however, that defendant's loan approval practices applied equally to all employees. (See Dkt. 27, Declaration of Jinyoung Kim Lee ("Lee Decl.") at ECF 332-33, ¶¶ 3-4). Defendant's company-wide policy was that all loan applications must be approved or denied within 30 days. (See id. at ECF 333, ¶ 4). Plaintiff does not cite a single instance in which any of his clients were delayed more than 30 days, nor does he produce evidence that other employees' clients' loan applications were approved more quickly than his.[10] (See, generally, Dkt. 1, Complaint; Dkt. 25, Joint Br.; Dkt. 27, Ajwani Decl.; Dkt. 29,

---

[9] In the SUF, plaintiff denies that, out of the eight employees in plaintiff's position, "only one, David, received a year-end discretionary bonus," and that "[t]he only reason that David received a year-end discretionary bonus in 2013 is that he spent the first half of 2013 in a different position that qualified for" the bonus. (Dkt. 25-1, SUF at D37-38). But plaintiff does not provide any explanation for his denial of these facts, and the evidence that he cites in support of his denial does not contradict either fact. (See id.).

[10] According to Jinyoung Kim Lee, a former Senior Credit Officer at Hanmi, plaintiff's "concern that loans were taking a long time to process" was "a common complaint from other similarly-situated employees." (See Dkt. 27, Lee Decl. at ECF 333, ¶ 10). The only uncommon delay involving one of plaintiff's clients occurred when a loan application was delayed due to a discrepancy in a required appraisal. (See id. at ECF 333-34, ¶ 12). The uniqueness of a

15

Pl. Supp.). As defendant notes, plaintiff "presents no evidence that his clients' loan applications were treated differently from anyone else's." (Dkt. 30, Def. Supp. at 6).

Fifth, plaintiff contends that "Korean employees attempted to take business from him by offering his Asian-Indian clients better loan terms" than those he was authorized to offer.[11] (Dkt. 25, Joint Br. at 11). The question here is whether defendant put plaintiff at a disadvantage in comparison to similarly situated employees. Plaintiff certainly appears to have been at a disadvantage because, while plaintiff could only offer a 5.25% interest rate to his clients, other Hanmi employees were allowed to offer a 4.5% rate to their clients.[12] (See Dkt. 27, Ajwani Decl. at ECF 353-54, ¶¶ 14 & 19). But by plaintiff's own admission, those other employees were not

---

discrepancy in a required appraisal is insufficient to constitute evidence to suggest that a similarly situated employee was treated more favorably than plaintiff.

[11] That plaintiff's co-workers may have tried to take business from him does not qualify as actionable conduct under the circumstances here. See Hellman v. Weisberg, 360 Fed.Appx. 776, 778 (9th Cir. 2009) (holding that co-worker conduct does not constitute an adverse employment action "where it does not have an effect on the employee's ability to perform her job"); Ray, 217 F.3d at 1245 (holding co-worker conduct is only actionable as harassment if "it is sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment and create an abusive working environment"); Vance v. Ball State Univ., 133 S.Ct. 2434, 2448 (2013) (explaining that, while co-workers can create a hostile work environment, "tangible employment actions fall within the special province of the supervisor"). Further, although plaintiff may have been upset that other employees were approaching his clients, the record does not support a finding that such conduct affected his ability to do his job. For example, plaintiff has produced no evidence to show that he lost any clients or commissions as a result of this conduct. (See, generally, Dkt. 1, Complaint; Dkt. 27, Ajwani Decl.); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998) (Title VII is not "a general civility code for the American workplace").

[12] Query whether defendant's practice of limiting the ability of different positions (i.e., BDOs, managers, or loan officers) to approve different interest rates could – depending on the customer base served by the different positions – have a disparate impact on certain protected classes covered under the Fair Housing Act ("FHA"). See, e.g., City of Los Angeles v. Bank of Am. Corp., 2014 WL 2770083, *11 (C.D. Cal. 2014) (finding plaintiff "sufficiently alleged a claim for disparate impact discrimination" under the FHA due to "a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers"); Garcia v. Country Wide Fin. Corp., 2008 WL 7842104, *7 (C.D. Cal. 2008) (finding plaintiff "stated a claim for disparate impact discrimination" under the FHA where "[d]efendants' use of yield spread premiums and other discretionary fees disproportionately and adversely affect[ed] minorities"). An interest rate should be based on the customer's financial qualifications, not on whether the customer is served by a BDO or a bank manager.

1 similarly situated to him; rather, they were managers and loan officers, not BDOs. (See id.); see
2 also Vasquez, 349 F.3d at 641 (holding that, to be similarly situated, employees must have similar
3 jobs and display similar conduct). According to the uncontroverted evidence put forth by
4 defendant, defendant's loan officers and BDOs do not have the same job. (See Dkt. 27, Lee
5 Decl. at ECF 332, ¶ 3). "Production-side employees, such as Business Development Officers or
6 Marketing Officers, obtain loan applications from their clients." (See id. at ECF 332, ¶ 3(a)).
7 "These loan applications are then assigned to a loan officer for underwriting purposes." (See id.
8 at ECF 332, ¶ 3(b)). "After a loan is underwritten by a loan officer, it is reviewed by a district loan
9 manager for completeness." (See id. at ECF 332, ¶ 3(c)). Based on this description, it appears
10 that employees in plaintiff's position have less authority than loan officers and managers. (See
11 id. at ECF 332, ¶ 3). The same is true outside the context of the loan approval process. For
12 example, managers also have the authority to grant immediate credit approval, while BDOs do
13 not. (See Dkt. 27, Kim Decl. at ECF 329, ¶ 14). In short, the evidence is undisputed that plaintiff
14 cannot establish a prima facie case of discrimination by comparing himself to employees with
15 different responsibilities. See Vasquez, 349 F.3d at 641; Moran v. Selig, 447 F.3d 748, 755 (9th
16 Cir. 2006) (noting that, for two employees to be similarly situated, their roles must be similar "in
17 all material respects").

18 Plaintiff further contends that defendant revoked his privilege of approving immediate bank
19 deposits for his clients. (See Dkt. 27, Ajwani Decl. at ECF 357, ¶ 32). Plaintiff describes
20 defendant's action as "a retaliatory policy and practice against [him] and some of [his] clients[,]"
21 (id.), but there is no evidence to support this assertion. The undisputed evidence shows that
22 approval for immediate bank deposits is controlled by defendant's "Reg CC Policy." (See Dkt. 27,
23 Kim Decl. at ECF 328, ¶ 10). "Generally speaking, when a Hanmi accountholder deposits a
24 check, the funds are not immediately available to the customer for withdrawal." (Id.). "Certain
25 Hanmi employees at the branch level have the authority to authorize an immediate credit for
26 deposits. This is basically an exception from the Reg CC Policy. We call this 'Immediate Credit
27 Authorization.'" (See id. at ECF 328, ¶ 12). "It is Hanmi's policy that BDOs and Marketing Officers
28 should not have Immediate Credit Authorization." (See id. at ECF 329, ¶ 14). "It appears that

17

1 [plaintiff] was given Immediate Credit Approval sometime prior to 2011. That was discovered in
2 an internal audit and corrected in 2011. Since 2011, no BDO has had Immediate Credit
3 Authorization." (See id. at ECF 329, ¶ 15). Plaintiff superficially disputes this evidence, (see Dkt.
4 25-1, SUF at D47-D52) (citing irrelevant portions of the record in support of denial), but offers no
5 evidence to raise a genuine issue of material fact as to this issue. (See, generally, Dkt. 25-1,
6 SUF; Dkt. 27, Joint App'x).

7 In short, while plaintiff attempts to link each adverse employment action with instances of
8 Korean employees who received more favorable treatment, (see Dkt. 25, Joint Br. at 11), he never
9 identifies any evidence in the record to support his assertions. (See, generally, Dkt. 25, Joint Br.;
10 Dkt. 29, Pl. Supp.). Because plaintiff has failed to establish a prima facie case that similarly
11 situated employees were treated more favorably by defendant, his disparate treatment claims
12 under § 1981, Title VII, and FEHA fail.

13 II. DISPARATE IMPACT.

14 Plaintiff argues that, even if his disparate treatment claims fail, summary judgment on his
15 Title VII and FEHA claims is inappropriate because "Hanmi has not even argued the alternative
16 test of disparate impact, and plaintiff need not produce evidence or argument in this regard." (See
17 Dkt. 25, Joint Br. at 13-14). In support of his argument, plaintiff invokes the Ninth Circuit's
18 decision in Nissan Fire & Marine Ins. Co., 210 F.3d 1099, in which the court held that "a moving
19 party without the ultimate burden of persuasion at trial thus may carry its initial burden of
20 production by either of two methods. The moving party may produce evidence negating an
21 essential element of the nonmoving party's case, or, after suitable discovery, the moving party
22 may show that the nonmoving party does not have enough evidence of an essential element of
23 its claim or defense to carry its ultimate burden of persuasion at trial." Id. at 1106. Plaintiff
24 contends that, under Nissan Fire, his disparate impact claim must survive summary judgment
25 because defendant did not produce evidence negating an element of that claim. (See Dkt. 25,
26 Joint Br. at 12-14).

27 Disparate impact claims "involve employment practices that are facially neutral in their
28 treatment of different groups but that in fact fall more harshly on one group than another and

cannot be justified by business necessity." Raytheon Co. v. Hernandez, 540 U.S. 44, 52, 124 S.Ct. 513, 519 (2003). Although plaintiff purports to have asserted disparate impact, (see Dkt. 25, Joint Br. at 1 & 12-14), and the Complaint does discuss some of defendant's policies, (see Dkt. 1, Complaint at ¶¶ 10-11, 19-20 & 24), plaintiff's Title VII and FEHA causes of action do not challenge any employment practices "that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." Ricci, 557 U.S. at 557, 129 S.Ct. at 2661; (see, generally, Dkt. 1, Complaint). Instead, plaintiff expressly states that defendant "intentionally discriminat[ed]" against him "on the basis of race or national origin." (Dkt. 1, Complaint at ¶ 46). In short, this case is clearly based on allegations of disparate treatment, not disparate impact. See, e.g., Yartzoff, 809 F.2d at 1373-74 (holding complaint alleging intentional discrimination on the basis of national origin "states claims for disparate treatment, not disparate impact"); Ricci, 557 U.S. at 583, 129 S.Ct. at 2675-76 (discussing the "interplay between the disparate-treatment and disparate-impact provisions of Title VII" and explaining that disparate impact liability involves "unintentional discrimination" caused by "practices that are fair in form, but discriminatory in operation").

But even if plaintiff did assert a disparate impact claim, defendant is entitled to summary judgment because the record contains no evidence to support such a claim. It is apparent that none of the policies and practices identified in the Complaint had a discriminatory effect on East Indian employees. For example, plaintiff complains that he did not receive a bonus in 2013, (see Dkt. 1, Complaint at ¶¶ 10-11), but the record shows that, under defendant's bonus policy, no employee in a comparable role to plaintiff received a bonus that year. (See Dkt. 25, Joint Br. at 15). Similarly, plaintiff contends that approval of his customers' loan applications was delayed, (see Dkt. 1, Complaint at ¶ 13), but the evidence is undisputed that defendant's loan approval practices created a delay for all bank customers, not just plaintiff's. (See Dkt. 27, Lee Decl. at ECF 332-33, ¶¶ 3-4). Notably, in the briefs, plaintiff's only argument on the subject of disparate impact is that defendant failed to sufficiently disprove it. (See Dkt. 25, Joint Br. at 12-14). Plaintiff cites no evidence to suggest that any policy or practice instituted by defendant caused a "disproportionately adverse effect" on plaintiff's protected class. (See, generally, Dkt. 25, Joint

Br.; Dkt. 29, Pl. Supp.). Without such evidence, plaintiff cannot establish a prima facie disparate impact claim under Title VII or FEHA. See Ricci, 557 U.S. at 557, 129 S.Ct. at 2661. Because plaintiff fails to establish either a prima facie disparate treatment or disparate impact claim, his § 1981, Title VII, and FEHA claims are dismissed.

## CONCLUSION

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

Based on the foregoing, IT IS ORDERED that defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment **(Document No. 25)** is **granted**. The above-captioned action is **dismissed with prejudice**. Judgment shall be entered accordingly.

Dated this 18th day of July, 2016.

/s/
Fernando M. Olguin
United States District Judge